UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MARIANNE E. GIARDINA,

                                             Plaintiff               DECISION AND ORDER

-vs-

                                                                   16-CV-6474 CJS

COMMISSIONER OF SOCIAL SECURITY,

                                             Defendant.
_____

APPEARANCES

For the Plaintiff:                    Justin M. Goldstein
                                         Kenneth R. Hiller
                                         Law Offices of Kenneth Hiller, PPLC
                                         6000 North Bailey Avenue, Suite 1A
                                         Amherst, New York 14226

For the Defendant:                Kristina D. Cohn
                                         Social Security Administration
                                         Office of General Counsel
                                         26 Federal Plaza, Room 3904
                                         New York, New York 10278

                                         Kathryn L. Smith, A.U.S.A.
                                         Office of the United States Attorney
                                         for the Western District of New York
                                         100 State Street
                                         Rochester, New York 14614

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant"), which denied the application of Marianne Giardina ("Plaintiff") for Social Security Disability Insurance Benefits ("SSDI") and Supplemental Security Income Benefits

1

("SSI").  Now before the Court is Plaintiff's motion for judgment on the pleadings (Docket No. [#12]) and Defendant's cross-motion [#16] for judgment on the pleadings.  Plaintiff's application is granted, Defendant's application is denied, and this matter is remanded to the Commissioner for further administrative proceedings.

FACTUAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action.  For purposes of resolving the pending application, it is sufficient to note the following facts.  Plaintiff, who was born in 1968, completed high school and also earned a certificate as a Home Health Aid. (T. 211).  Plaintiff has three adult children. (T. 52-53).  Plaintiff previously worked as a restaurant waiter/server and bartender and as a home health aide (T. 55-57, 58, 234).  Plaintiff last worked in 2011, as a waitress, but was fired from that job after arguing with a customer. (T. 55, 201).  Plaintiff claims to suffer from bipolar disorder, depression, anxiety and arthritis of the hips. (T. 60, 62).

In February 2013, Plaintiff began receiving treatment for her mental health concerns from Tulio Ortega, M.D. ("Ortega").  Apparently, at that time Plaintiff was particularly depressed and upset because an abusive romantic relationship had ended.[1]  Thereafter, Plaintiff had office visits with Ortega approximately every other month.(T. 62).  Unfortunately, the narrative sections of Ortega's office notes between February 2013 and August 2014 are handwritten and generally illegible, though multiple references to a poor relationship with a boyfriend, head trauma and chronic pain are evident. (T. 427-442).  However, the sections of Ortega's notes concerning mental status exams are generally

---

[1](T. 323) (Report of Yu-Ying Lin, Ph.D., stating: "She reported depressive symptoms since 02/13 due to an abusive relationship."); (T. 422) (Ortega office note referring to "interpersonal problems.")

much more legible, since they mainly consist of the words "intact," "good" or "fair," written after particular categories of mental status. In that regard, on March 21, 2013, Ortega noted that Plaintiff was alert and oriented, her thought process was clear and not psychotic, her insight, attention, concentration and fund of knowledge were "fair," and her memory was "intact." (T. 440).

On April 1, 2013, Plaintiff applied for SSDI and SSI benefits. (T. 11). Plaintiff originally claimed to have become disabled in March 2011, but later amended her onset date to February 2013. (T. 52, 53, 176, 192). Apparently, this was because Plaintiff did not seek medical treatment for her impairments until February 2013. (T. 49, 60-61). Plaintiff claimed to be disabled due to "major bipolar," "anxiety," "joint disease" and "depression." (T. 210). Plaintiff indicated that she stopped working on March 10, 2011, "because of [her] conditions." (T. 210).

When Plaintiff applied for benefits, she indicated that she could not stand or sit for long periods, and that her depression made it hard for her to concentrate. (T. 220). Plaintiff also stated that her hip pain was worsening. However, Plaintiff indicated that she could perform "housework, laundry [and] cook[ing]," including cooking and doing laundry for her daughter, and that she cared for her dogs. (T. 221-223). Plaintiff also indicated, in her application, that she performed her own shopping. (T. 224-225). Plaintiff further stated that she could follow instructions, and that she had no difficulty getting along with "bosses" "or other people in authority." (T. 227).

On April 19, 2013, Ortega reported that Plaintiff was "still very emotionally labile," "temperamental," and "irritable," and had "pressured speech." (T. 439). However, Plaintiff's memory was "intact," her attention and concentration were "good," and her

3

insight, fund of knowledge and judgment were "fair." (T. 439). Ortega increased Plaintiff's dosage of Seroquel. (T. 439).

On April 29, 2013, Yu-Ling Lin, Ph.D. ("Lin") performed a consultative psychiatric evaluation at the Commissioner's request. (T. 323-326). Plaintiff reportedly told Lin that she had been experiencing depression and anxiety since February 2013, "due to an abusive relationship." (T. 323). Plaintiff also reported having manic-type symptoms several times per week, and difficulty sleeping. (T. 323-324). Plaintiff reportedly told Lin that she could perform all of her own daily activities, such as bathing, cooking, cleaning, laundry and cooking, though her hip pain made those activities "difficult at times." (T. 325). The results of Lin's examination were essentially normal, except that she found Plaintiff to have "mildly impaired" attention and concentration and "moderately impaired" recent and remote memory, which Lin attributed to "anxiety." (T. 324-325). Lin's primary diagnosis was "adjustment disorder with mixed anxiety and depressed mood," as well as "bipolar disorder NOS." (T. 326). With regard to the diagnosis of "adjustment disorder," Lin apparently attributed much of Plaintiff's then-current depression and emotional lability to the demise of her relationship with her boyfriend, as opposed to a chronic condition. Lin concluded that Plaintiff could work at a simple, low-stress job, and in that regard her medical source statement was as follows:

> The claimant can follow and understand simple directions and instructions and perform simple tasks independently. She is mildly limited in maintaining attention and concentration. She is able to maintain a regular schedule. She can learn new tasks. She is mildly to moderately limited in performing complex tasks independently. She can make appropriate decisions. She can relate adequately with others. She is moderately to markedly limited in appropriately dealing with stress. Difficulties are caused by fatigue and stress-related problems. The results of the examination

4

appear to be consistent with psychiatric problems, but in itself this does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis.

(T. 325-326).

On April 29, 2013, Karl Eurenius, M.D. ("Eurenius") performed a consultative internal medicine examination at the Commissioner's request. (T. 328-331). The primary focus of the examination was Plaintiff's hip pain. Plaintiff reportedly told Eurenius that cortisone injections "helped significantly" with her hip pain, and that physical therapy helped her range of movement. (T. 328). Eurenius noted that Plaintiff was using a cane, which "seem[ed] to be helpful." (T. 329). Eurenius performed a physical examination and concluded that Plaintiff was "mildly to moderately limited in bending, lifting, climbing, walking, and lying on her left side due to chronic left hip pain secondary to osteoarthritis." (T. 331).

On May 20, 2013, Ortega reported that Plaintiff was showing some improvement, and was "less accelerated, labile and emotional," and more "receptive to input." (T. 438). Ortega reported that Plaintiff was alert and oriented; her speech was spontaneous, clear and "less emotional;" her thought content was "less perseverative;" her memory was "intact;" her insight, attention, judgment, associations and concentration were "good;" and her fund of knowledge was "fair." (T. 438).

Also on May 20, 2013, Ortega completed a disability report. (T. 332-338). Ortega's handwriting is very difficult to read, but the following points can be discerned: Ortega began treating Plaintiff on February 27, 2013; Ortega's diagnosis was "major depression, chronic, severe, [rule out] bipolar disorder mixed 7 yrs, borderline

5

personality"; Plaintiff's symptoms included increased anxiety, poor sleep, poor impulse control, crying spells, pressured speech and aggressive behavior; Plaintiff was "extremely labile" when Ortega first saw her on February 27, 2013; Plaintiff was "unable to work at present"; and Plaintiff had only "limited" ability to interact with others socially, due in part to "poor temper . . . control." (T. 332-337).

Between June 2013 and August 2014, Ortega's notes appear to indicate that Plaintiff's condition remained consistent, and the results of Plaintiff's mental status examinations were similar to those of the exam on May 20, 2013, discussed earlier. During this period, the office notes contain frequent references to Plaintiff's relationship with her boyfriend, although the bulk of the narrative sections are indecipherable.

Beginning in October 2014, Ortega's notes are typed and legible. On October 7, 2014, Ortega reported in an office note that Plaintiff was complaining of increased anxiety, sadness, and anger; difficulty concentrating, irritability, poor sleep and decreased energy. (T. 424). Ortega noted that Plaintiff appeared to display "signs of moderate depression." (T. 424). However, Ortega reported that Plaintiff's "self care skills [were] intact"; her speech was normal; her thinking was logical and her thought process was appropriate; her cognitive functioning was intact; her short-term and long-term memory was intact; her insight into her problems was fair; and there were no signs of "psychotic process." (T. 424-425). Ortega continued to prescribe Celexa, Latuda and Wellbutrin. (T. 425).

On December 2, 2014, Ortega reported that Plaintiff continued to complain of the same symptoms, but reported feeling somewhat better, which she attributed to Wellbutrin. (T. 421). Ortega noted that Plaintiff was reporting better ability to

6

concentrate. (T. 421) ("Difficulty concentrating is no longer described."). Plaintiff indicated that she was anxious and nervous about her disability application. (T. 421). Generally, Ortega stated: "Depressive symptoms are chronically present. Depressive symptoms are episodically present. Ms. Giardina's mood depression typically lasts for days. Symptoms, as noted, have improved as they are less frequent or less intense. Ms. Giardina today denies any recent acting out behavior. She reports that her energy has decreased. She describes anhedonia[,] excessive worrying[,] irritability[, and] decreased sociability[.]" (T. 421). Ortega continued to prescribe Celexa, Latuda and Wellbutrin. (T. 422-423).

Also on December 2, 2014, Ortega completed a report concerning Plaintiff's mental ability to do work-related activities, using a form apparently provided by Plaintiff's representative. (T. 444-445). In pertinent part, Ortega checked boxes indicating that Plaintiff would have "moderate limitation"[2] working closely with others without being distracted and maintaining "socially appropriate behavior, and that she would have "marked limitation"[3] in her ability to perform at a normal pace, handle normal work stress, interact appropriately with the public and accept instructions and criticism from supervisors. (T. 444-445).

As mentioned earlier, Plaintiff also has hip pain, which is severe at times and interferes with her sleep. Plaintiff attributes this pain to degenerative changes caused by carrying heavy trays of food while waitressing. X-rays of Plaintiff's left hip taken in March 2013 show "minimal degenerative abnormality." (T. 281, 296, 298). A doctor's note in

---

[2]The form defines "moderate limitation" as "unable to perform the task 1/3rd of the time." (T. 444).

[3]The form defines "marked limitation" as "unable to perform the task 2/3rds of the time." (T. 444).

7

June 2014 attributes Plaintiff's hip pain to "trochanteric bursitis." (T. 409). An "arthrogram" performed in November 2014 found "no fracture/dislocation or significant arthritic changes" in either hip (T. 416), but MRI testing found a tear in the "anterior superior labrum," as well as "tendinopathy of the gluteus medius and minimus tendons." (T. 417). Plaintiff's orthopedic specialist referred to such findings as showing "some mild cartilage wear and degenerative changes of the labrum." (T. 418). For her hip pain, Plaintiff has received pain injections and physical therapy, but claims that neither of those have been very effective. (T. 66, 70-72). Plaintiff maintains that her doctors have discussed the possibility of surgery to alleviate her pain, if medication and physical therapy prove to be ineffective.

On November 24, 2014, a hearing was conducted by an Administrative Law Judge ("ALJ"), at which the ALJ took testimony from Plaintiff and from a Vocational Expert ("VE"). The Court observes that this hearing was held twenty months after Plaintiff first applied for benefits, and nineteen months after the consultative examinations by Doctors Lin and Eurenius.

At the hearing, Plaintiff indicated that she was fired from her last job as a waitress, where she had worked for two years, after she "got into a heated argument with one of the customers." (T. 55). Plaintiff stated that she lives with the youngest of her three adult daughters, and has four dogs. (T. 53, 68). Plaintiff indicated that she has difficulty lifting anything over five pounds, cannot stand or sit for very long without changing position, and has trouble concentrating because she gets very little sleep due to pain from her hips. (T. 64-67). Plaintiff testified that she does not perform any household chores, and that her daughter and a male friend take care of all the chores. (T. 72). For example,

8

Plaintiff indicated that she does not cook (T. 72); that she needs assistance from her daughter to bathe (T. 73); and that her friend performs all the shopping. (T. 67). Plaintiff stated that she takes Latuda, Wellbutrin and Celexa for her mental impairments, which help "a little bit." (T. 61).

On February 27, 2015, the ALJ issued a decision denying Plaintiff's claims for benefits. (T. 11-22). The ALJ found that Plaintiff has severe impairments consisting of bilateral hip arthritis, depression, bipolar disorder, and anxiety disorder, which do not meet or medically-equal a listed impairment. (T. 14-16). The ALJ then found that despite such impairments, Plaintiff has the residual functional capacity ("RFC") to perform less-than-a-full-range of sedentary work:

> [C]laimant has the residual functional capacity to perform sedentary work . . . except that the claimant is limited to simple, routine tasks; and is limited to frequent but not constant interaction with coworkers, supervisors and the general public.

(T. 16). In arriving at that RFC assessment, the ALJ discussed the medical evidence, and gave "great weight" to the opinions of Eurenius and Lin, but "only some weight" to Dr. Ortega's opinion, purportedly because "the medical evidence of record and Dr. Ortega's own treatment notes do not support the severity of the limitations in his opinions." (T. 18). The ALJ gave essentially three reasons for assigning "only some weight" to Ortega's opinion: 1) Ortega's opinion was inconsistent with the GAF score that he assigned Plaintiff (T. 19); 2) Ortega's opinion was inconsistent with the findings of his own mental status examinations (T. 19); and 3) the form that Ortega used did not properly define terms such as "slight limitation." (T. 20). The ALJ also found that Plaintiff's subjective statements concerning the effects of her symptoms were "not

9

entirely credible." (T. 17).

Using the aforementioned RFC finding and testimony from the VE, the ALJ further found that there were particular jobs that Plaintiff could perform. (T. 21). Consequently, the ALJ found that Plaintiff is not disabled. Plaintiff appealed, but the Appeals Council declined to review the ALJ's determination.

On July 8, 2016, Plaintiff commenced the subject action. On February 17, 2017, Plaintiff filed the subject motion [#12] for judgment on the pleadings, and on May 25, 2017, Defendant filed the subject cross-motion [#16] for judgment on the pleadings.

Plaintiff's motion for judgment on the pleadings broadly alleges that the Commissioner's decision is affected by two errors: 1) the ALJ's RFC finding "is unsupported by substantial evidence and is inconsistent with legal standards"; and 2) the ALJ failed to evaluate Plaintiff's credibility pursuant to the appropriate legal standard."[4]

More specifically, Plaintiff claims that the ALJ's decision to give greater weight to the opinion of Dr. Lin than to the opinion of Dr. Ortega was erroneous for the following reasons: 1) the ALJ incorrectly stated that Dr. Lin's report was entitled to great weight, in part, because Lin had reviewed Plaintiff's medical records, when in fact Lin had not reviewed the medical records; 2) the ALJ stated that Lin's opinion was consistent with the medical evidence, but such statement was erroneous because much of the record (Dr. Ortega's office notes) was illegible, and therefore "[i]t is impossible to determine" whether Lin's opinion is actually consistent with much of the medical record; 3) the ALJ erred by finding that Dr. Lin's opinion was more consistent with the medical record than Dr. Ortega's opinion, since, again, much of the medical record pertaining to Plaintiff's mental

---

[4]Pl. Memo of Law [#12-1] at p. 1.

10

health consists of Ortega's office notes, and it "does not make sense to credit Dr. Ortega's findings in his treatment notes [insofar as they support Lin's opinion] while [simultaneously] rejecting Dr. Ortega's opinion;" 4) even if the ALJ properly gave proper weight to Dr. Lin's opinion, he failed to incorporate all of Lin's limitations (concerning stress)[5] into the RFC finding; 5) the ALJ "fail[ed] to weigh or acknowledge" Ortega's first opinion report, dated May 20, 2013; and 6) with regard to Ortega's second opinion, dated December 2, 2014, the ALJ failed to give good reasons for assigning such opinion only some weight, because he incorrectly stated that such opinion was inconsistent with Ortega's treatment notes.

Further, Plaintiff claims that the RFC finding concerning Plaintiff's physical limitations was erroneous because it failed to include all of the limitations identified by Dr. Eurenius. Specifically, Plaintiff claims that the RFC finding failed to incorporate limitations concerning her inability to bend or climb, and failed to indicate that she needs a cane to ambulate.

Finally, Plaintiff contends that the ALJ's credibility determination was erroneous because it was based upon "factual misconceptions," and because it did not give an adequate explanation for the credibility finding, but instead, merely summarized the evidence without discussing the factors in 20 C.F.R. § 404.1529.

Defendant counters that the ALJ's decision properly applied the law and is supported by substantial evidence. In particular, Defendant asserts that it is unclear whether Dr. Lin actually reviewed Plaintiff's medical records, but even if she did not, the

---

[5]See, Pl. Memo of Law [#12-1] at p. 20 ("The ALJ failed to incorporate any limitations relating to Plaintiff's ability to deal with stress.").

other reasons that the ALJ gave for assigning weight to Lin's opinion were correct; that even if portions of Ortega's notes are illegible, those are not the portions upon which the ALJ relied; that the ALJ incorporated Lin's opinion, regarding Plaintiff's limited ability to handle stress, into the RFC by limiting Plaintiff to simple routine tasks and limited contact with people; that the ALJ did, in fact, consider Ortega's May 2013 opinion; that the ALJ correctly found that Ortega's December 2014 opinion was inconsistent with the rest of the medical evidence, including Ortega's own notes; that the ALJ was not required to expressly include the limitations identified by Eurenius, or the fact that Plaintiff uses a cane to walk, into the RFC; and, that the ALJ properly evaluated Plaintiff's credibility.

On June 13, 2107, Plaintiff filed a reply [#17], that essentially reiterates the arguments in her opening brief [#12-1].

## STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive." The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

Here, the Court finds that remand to the Commissioner is required, for essentially the same reasons asserted by Plaintiff. For example, it does appear that the ALJ incorrectly gave additional weight to Lin's opinion based upon the idea that Lin had reviewed Plaintiff's medical record, when there no indication that Lin actually had such

12

records. Rather, it appears that Lin relied solely upon Plaintiff's oral history of her treatment.

Further, the Court agrees that the ALJ erred insofar as he indicated that Lin's opinion was "consistent with the objective medical evidence of record," since, as Plaintiff points out, much of that record was illegible. Specifically, the records of Plaintiff's mental health treatment consist almost exclusively of Ortega's notes, which, between February 2013 and October 2014, are mostly illegible. Although the ALJ, like the Court, was able to decipher the mental-status-exam findings, he was not able to consider pages of narrative report that would have likely shed additional light on Ortega's opinion. Accordingly, it is unclear whether Lin's opinion was actually consistent with those portions of the medical record. For the same reason, it is not clear that Ortega's opinions were inconsistent with his treatment notes.[6]

Moreover, the ALJ seemingly overlooked the fact that Lin's report and Ortega's reports are largely consistent. For example, Lin indicated that Plaintiff was "moderately to markedly limited in appropriately dealing with stress," while Ortega stated that Plaintiff was markedly limited in dealing with stress. (T. 325, 445). Similarly, Lin and Ortega agree that Plaintiff can handle simple work tasks and maintain a regular schedule. (T. 325, 444). Additionally, it seems that Lin and Ortega may even agree concerning Plaintiff's ability to maintain a consistent pace; in that regard, Ortega stated that Plaintiff

---

[6]When the ALJ referred to Ortega's "treatment notes," he was apparently referring to the results of the mental status examinations which, as the Court previously mentioned, were typically fair to good. (T. 19) ("[T]he claimant's psychiatric progress notes show that consistently on mental status examination she was assessed fair to good in her judgment, memory, attention and concentration, which is drastically inconsistent with Dr. Ortega's assessment of marked limitations."). The ALJ did not, and, frankly, could not, say whether Ortega's opinion reports were inconsistent with the longer narrative sections of his office notes, since those sections are largely illegible.

13

would have a marked limitation, while Lin did not specifically mention pace, but noted that "difficulties are caused by fatigue and stress-related problems." (T. 325, 445).

However, one important area where the reports of Lin and Ortega diverge is with regard to Plaintiff's ability to interact appropriately with other people. On this point, Ortega states that Plaintiff has a marked limitation, apparently based upon his observations, on multiple occasions, of Plaintiff being angry, irritable, aggressive and extremely labile. Lin, on the other hand, indicated that Plaintiff "can relate adequately with others." (T. 325). Such statement by Lin is therefore not consistent with the medical record, and the ALJ did not explain how he resolved that inconsistency.

The Court also agrees with Plaintiff that the ALJ should have explained how Plaintiff's use of a cane factored into the RFC determination, if at all. In that regard, the cane was prescribed, and Eurenius observed that the cane was helping Plaintiff to ambulate. However, the ALJ did not refer to the cane in his RFC finding, and did not ask the VE whether Plaintiff would be able to perform particular jobs if she were using a cane. It is unclear whether that was due to an oversight, or because the ALJ did not believe that Plaintiff needs a cane to ambulate.

Lastly, with regard to Plaintiff's credibility generally, it appears that the ALJ found Plaintiff to be "not entirely credible" in part because when Plaintiff applied for benefits she made statements about the effectiveness of certain treatments, and about her abilities to perform activities such as household chores and shopping, that are seemingly inconsistent with her testimony at the hearing. (T. 15-20). However, the former statements were made in early 2013, while the hearing did not take place until late November 2014, and there is evidence that Plaintiff's condition worsened during that

14

period, and that her pain treatments became less-effective over time. (T. 63, 65-67, 70-71, 406-408, 410-411, 418, 424). Plaintiff's last-insured date for SSDI benefits is December 31, 2016. It does not appear that the ALJ considered the aforementioned evidence of Plaintiff's worsening symptoms when he evaluated Plaintiff's credibility. Instead, it appears that the ALJ merely viewed the apparent inconsistency between the statements as a justification for finding that Plaintiff was "not entirely credible."

## CONCLUSION

For all of the foregoing reasons, Plaintiff's application for judgment on the pleadings [#12] is granted, Defendant's cross-motion [#16] is denied, and this matter is remanded to the Commissioner for further proceedings consistent with this Decision and Order. The Clerk of the Court is directed to close this action.

So Ordered.

Dated: Rochester, New York
      July 20, 2018

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge